TROWBRIDGE v. UNITED STATES.

No. 3993.

District Court, D. Connecticut.

Dec. 5, 1938.

Bronson, Rice & Lyman, Cleaveland J. Rice and Charles M. Lyman, all of New Haven, Conn., for plaintiff.

James W. Morris, Asst. Atty. Gen., Andrew D. Sharpe and J. Leonard Lyons, Sp. Assts. to Atty. Gen., and Robert P. Butler, U. S. Atty., and L. Y. Gaberman, Asst. U. S. Atty., both of Hartford, Conn., for defendant.

HINCKS, District Judge.

Findings of Fact.

1. The plaintiff is a resident of the State of Connecticut and there resided at all times herein mentioned.

2. On or before March 15, 1934, the plaintiff duly filed in the office of the Collector of Internal Revenue for the District of Connecticut, an income tax return upon Form No. 1040 covering the calendar year 1933.

3. In said return, the plaintiff claimed as a deduction the sum of $19,700 representing a claimed loss by reason of the fact that 200 shares of the first preferred stock of the Connecticut Mills Company had become worthless during the calendar year 1933.

4. Of said 200 shares of stock, the plaintiff purchased 100 shares on June 18, 1919, and 100 shares on December 29, 1919, at a total cost of $19,700.

5. By letter dated October 29, 1935, the Commissioner of Internal Revenue gave notice to plaintiff of a deficiency of $5,861.-83, of which amount $5,782.95 was based upon the disallowance of said claimed loss.

6. A protest against the proposed assessment of said deficiency was filed by plaintiff through his attorney on or about November 8, 1935, with Hon. Charles T. Russell, Deputy Commissioner of Internal Revenue, Washington, D. C.

7. Thereafter said deficiency was duly assessed by the Commissioner of Internal Revenue.

8. On June 17, 1936, the deficiency so assessed, together with interest thereon in the amount of $782.27, was paid by plaintiff in the total amount of $6,644.10, and of this amount $6,554.69 represents the deficiency of $5,782.95 assessed upon the disallowance of said loss plus interest thereon to June 17, 1936, in the sum of $771.74.

9. On or about July 7, 1937, plaintiff duly filed a claim for refund of said tax of $5,-782.95 plus interest paid as aforesaid.

10. On or about December 28, 1937, said claim for refund was duly disallowed.

11. The reason for the disallowance of said claimed loss in the amount of $19,700 was that the stock, with respect to which said loss was claimed, was claimed by said Commissioner to have become worthless prior to the calendar year 1933.

12. The Connecticut Mills Company was organized under the laws of Massachusetts in 1919 and was capitalized as follows:

First preferred stock,
| | |
|---|---|
| (net of $135,200 in treasury) | $1,285,300. |
| Second preferred | 1,065,100. |
| Common Stock Class A | 612,500. |
| Common Stock Class B | 90,500. |

In 1919 it purchased a plant at Fall River, Massachusetts. Subsequently it purchased a plant in Danielson, Connecticut, and acquired and operated a wholly owned subsidiary in East Taunton, Massachusetts. The Taunton property (buildings, waterpower, and machinery) was originally subject to a mortgage of $400,000 which by 1932 or 1933 had been reduced to about $70,000. Subsequently Connecticut Mills entered into an arrangement with Textile Realty Company of Alabama whereby the Realty Company built a plant at Decatur, in that state, costing about $600,000 (subject to a mortgage of $390,000) which it leased to Connecticut Mills for an agreement whereby Connecticut Mills undertook to pay taxes, and insurance on the plant, to pay 7% dividends on the Realty Company Common stock, and to assume the outstanding bonds. Under the contract, Connecticut Mills also became obligated ultimately to purchase the Decatur plant at its cost. In 1927 Connecticut Mills moved all its machinery from its Fall River plant and half of its machinery from its Danielson plant to Decatur.

13. The principal business of Connecticut Mills was the manufacture and sale of tire fabric, although it also produced some hosiery yarn. Previous to 1923, Connecticut Mills had earned substantial profits. But due to the increasing trend on the part of tire manufacturers to manufacture their own fabric, after 1923 Connecticut Mills suffered losses in net income as follows:

$ 22,000. in 1924
2,000. in 1925
250,000. in 1926
700,000. in 1927
525,000. in 1928
300,000. in 1929
550,000. in 1930
250,000. in 1931
110,500. in 1932
900,000. in 1933

The Danielson plant was sold in 1927. Its Fall River plant was idle after 1927. And production in all the plants ended prior to December 31, 1932.

Comment.

For legal effect of termination of production, compare Benjamin v. Commissioner, 2 Cir., 70 F.2d 719.

14. The consolidated balance sheet of Connecticut Mills as of December 31, 1932 (Exhibit H, Schedule K–2) showed total book assets of slightly over $1,000,000 and liabilities of only $172,058.74.

Comment.

In urging that said stock had earlier lost all value, the defendant suggests that the balance sheet (paragraph 14, supra) was subject to two major adjustments. It contends first that the Taunton assets shown in the balance sheet as over $400,000 should be reduced to $20,000. To be sure, in 1933 the Taunton assets were ultimately turned over to the mortgage trustee for only $20,000. The contention, however, implies that the fair current value of the item must be fixed by its price at a subsequent forced sale made in the trough of the depression. With this I cannot agree. There is, to be sure, evidence that the balance sheet does not reflect all the depreciation accrued against the Taunton plant since the discontinuance of operations there in 1927. But as to this it is reasonable to infer that the item of depreciation is of minor dimensions and without any controlling significance for present purposes. The defendant points to Exhibit 10, where-

in the Company president, under date of January, 1934, states that the Taunton assets "then remaining of an aggregate estimated value of $20,118.97 were transferred to the trustee under the mortgage." The defendant claims this as evidence that the value as of April, 1932, was only $20,000. I do not so construe the statement. To me the context indicates that $20,000 was treated as the value when the assets were transferred in 1933 rather than in 1932. In any event it is clear that the president was referring only to a forced-sale value.

The second claimed adjustment consists in a claimed addition of some $800,000 to the liabilities as a result of the default upon the agreement with Textile Realty Company relating to the Decatur plant. But the defendant overlooks the fact that if the balance sheet is adjusted to show this addition to the liabilities, the assets must correspondingly be credited with the value of the plant which a few years before had been built at a cost of some $600,000.

15. In 1933, the only corporate activities related to negotiations for affiliations and to liquidation. Throughout the year the President was retained at substantially full salary and until the middle of the summer was engaged in negotiations looking to an affiliation with the Firestone Tire Company of Akron. For the first half of the year there was substantial justification for optimism over the possibility of such an affiliation, because the Firestone Company had theretofore been a large and satisfied customer of the company and manufactured a lesser percentage of its own demand for tire fabric than any of the other large companies. However, before the end of summer the negotiations had broken down and the remaining assets were liquidated under pressure by the mortgage creditors leaving nothing for distribution to preferred stockholders even though their stock carried a preference in liquidation.

16. In 1931 default was made upon the obligation of the mortgage bonds upon the East Taunton plant and a Bondholders' Committee was appointed prior to March 15, 1932. In 1932 the company defaulted upon its obligations under its agreement with Textile Realty covering the Decatur plant. However, I find no evidence to indicate that the obligations of the company to Textile Realty thereby were accelerated. From the fact that the Textile Realty Company had been organized by

Southern creditors and affiliates of Connecticut Mills and that theretofore (vide, Exhibit C) the Southern creditors had deprecated the possibility of precipitate action, I infer that even if this default was legally effective to accelerate the obligation it did not preclude further negotiations by Connecticut Mills for an affiliation with some large customer. Prior to January 1, 1933, the company was unable to meet its debts as they matured.

17. In April, 1932, the stockholders voted to authorize the directors to sell, lease or exchange the assets of the company, including its good will, in the discretion of the directors. In November, 1932 (Exhibit B) the stockholders authorized their officers to discharge the claim of the Textile Realty Company by a surrender of certain corporate assets in the Decatur plant. It was not until December 18, 1933, that the stockholders voted that the corporation be dissolved. By this time, however, the liquidation earlier authorized had been substantially completed. The legal dissolution of the corporation took place in 1935.

### Comment.

The defendant leans heavily upon the vote of April, 1932, as pointing to demonstrated and hopeless insolvency at that time. To me it appears more reasonable, in the light of the other facts, to construe the vote as designed to pave the way for negotiations for an affiliation or an advantageous sale. The inclusion of authority to "exchange" assets suggests a merger rather than a forced sale. Likewise as to good will, the sale of which was impossible in the event of piece-meal liquidation. Doubtless it was foreseen that no "savior" could be induced to negotiate until satisfied by some such vote that the negotiating officers were authorized to go through with any program which might be agreed upon. Indeed, in the absence of such a vote the defendant might have attacked the bona fides of the 1933 negotiations.

18. "Standard Stock Offerings", which is a book listing bids and offerings on over-the-counter securities relied upon by brokers and investment firms throughout the country in their transactions in such securities as an indication of the market, shows quotations on Connecticut Mills first preferred stock ranging from $98½ in 1919 to a bid for 100 shares in January, 1933 at $1½. It shows further an auction sale of 50 shares in 1930 at $5¼ per share.

Also in October 1932 a bid of 50¢ and an offer of $4 for 25 shares.

### Comment.

The foregoing item, though obviously of slight weight, constituted competent evidence. Wigmore, Vol. 3, Sec. 1704.

I also admitted in evidence an extract on the subject of Connecticut Mills from Fisher's Manual which was also shown to be a publication relied upon by brokers. This extract, though containing no data on sales or current price lists, contained considerable information which if currently relied on by brokers generally would seem calculated to affect current market values. I now notice that the publication was dated 1938 and find no evidence that the matter contained therein was current in a 1933 edition. If the date of publication had been seasonably called to my attention I should have excluded the offer. As it is I disregard the item. The matter is of slight importance since most of the factual matter contained in the extract appears elsewhere in the record. And the opinion expressed therein as to when the stock became worthless obviously lacks the quality of competent evidence and so has not entered into my conclusions hereinafter stated.

19. Upon the foregoing facts, and upon the whole record, I find as an ultimate fact that the unsuccessful termination of the negotiations beween Connecticut Mills and the Firestone Tire Company in the summer of 1933 was the event which extinguished the value of the first preferred stock of Connecticut Mills.

### Comment.

Having seen and heard the company's president on the witness stand, I give full credit to his testimony relative to these negotiations. I note that the Board of Tax Appeals in the case of Shurtleff v. Commissioner, 35 B.T.A. 1236, May 10, 1937, a case relating to a disallowed deduction for the loss of common stock of Connecticut Mills, likewise credited the evidence before it on this feature. With this evidence long known to it, the defendant neither by cross-examination nor by brief questioned the reality of these negotiations. To be sure, the evidence is offered by the plaintiff but there is nothing to suggest that it was to the plaintiff's advantage to deduct this loss in 1933 rather than earlier

as the defendant now insists he should have done.

### Conclusions of Law.

I. The plaintiff's loss with respect to his first preferred stock in the Connecticut Mills Company within the meaning of the Revenue Act of 1932, Sec. 23(e), 26 U.S.C.A.Int.Rev.Acts, page 490, was sustained in the calendar year 1933.

### Comment.

The foregoing conclusion is not necessarily at variance with that adopted by the Board of Tax Appeals in the case of Shurtleff v. Commissioner, referred to above. For the common stock of Connecticut Mills was junior to over $2,250,000 of preferred stock (Paragraph 12, supra) and thus well might have met an earlier extinction. However that may be, for their relation to the value of first preferred stock the 1933 negotiations with the Firestone Company against the background of the other facts in my judgment have a controlling significance. For value is a quantity dependent upon some form of market. The negotiations fairly imported a potential market. Thus here, the existence of a potential market in the nature of things would tend to preserve some value at least in the first preferred stock.

■ Human nature shrinks from accepting as final the drastic losses inherent in an economic depression believed to be of temporary duration. This is not necessarily the quality of incorrigible optimism sometimes seen. Cf. Wesch v. Helburn, D.C., 5 F.Supp. 581; DeLoss v. Commissioner, 2 Cir., 28 F.2d 803. It may rather be a reasonable optimism such as gave rise to bankruptcy legislation providing for corporate reorganizations,—legislation since justified by experience and reenacted in the Bankruptcy Act of 1938, 11 U.S.C.A. § 501 et seq. Such optimism will be reflected in market values and even react upon underlying intrinsic values; it will be sustained and nourished by the prospect of potential markets. Though its appraisals may lack scientific method, the reality of its existence cannot be denied. Thus daily we read of stock market transactions in securities of corporations undergoing reorganization under the Bankruptcy Act. I suppose it is general knowledge—certainly it lies within my own observation—that multitudes of such transactions involve prices without much approximation (certainly without conscious approximation) to book values, to forced-sale values or to values indicated by current earnings. Rather they are based upon hope for the future. The same attributes are present, though perhaps less readily discernible, in securities whose only market is over the counter. Their values also respond to the actual prospect of a potential market either for their product or their plant.

■■ Thus it is that I feel required to recognize a value for the stock here involved as long as it could look to an actual prospect of a market for its underlying plant. In January, 1933, whether then solvent as its books indicated or already insolvent as later it clearly was when constrained to liquidate on a forced-sale basis, the company was doubtless unable to meet its debts as they matured. If Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, had then been on the Statute Books, it could have filed a petition under the Act in good faith. Instead, in good faith it attempted unaided to work out its salvation by negotiating an affiliation with a former customer and large consumer. These negotiations continued over several months and until they failed the value of the first preferred stock was not wholly extinguished. Benjamin v. Commissioner, 2 Cir., 70 F.2d 719; Olds & Whipple v. Commissioner, 2 Cir., 75 F.2d 272, 275. While I should hesitate to accept as an invariable rule all the broad language used in Gowen v. Commissioner, 6 Cir., 65 F.2d 923, I agree that where "all reasonable hope and expectation of even a partial return of capital is gone, the taxpayer should not be permitted to delay taking the deduction." Id., 65 F.2d page 924. The instant case on its facts falls outside this doctrine. See also Burnet v. Imperial Elevator Company, 8 Cir., 66 F.2d 643. The cases cited by the defendant, though containing several points of resemblance, in other controlling aspects must all be distinguished from the case at bar.

II. The plaintiff is entitled to recover from the defendant the sum of $6,554.69, with interest thereon from June 17, 1936 and his costs.

III. The defendant's motion for judgment should be denied.

The Clerk will enter judgment accordingly forthwith.